IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40357-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PERFECTO SALGADO GALEANA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, C.J. — Perfecto Salgado Galeana[1] appeals his convictions of second

degree assault and tampering with physical evidence. He raises four primary arguments

on appeal. First, he contends the court committed reversible error by allowing irrelevant

and highly prejudicial expert testimony from an unqualified witness. Second, he claims

multiple constitutional errors pertaining to the translation and admissibility of his jail

calls. Third, he argues the 911 operator's testimony was inadmissible hearsay. Finally,

he asserts insufficient evidence supports his conviction for tampering with physical

evidence.

---

[1] In his briefing, this appellant refers to himself with the singular surname
"Salgado."

We affirm the conviction for second degree assault but agree with Salgado that sufficient evidence does not support the conviction for tampering with physical evidence. Thus, we reverse the conviction for tampering with physical evidence and remand with instructions to dismiss this charge with prejudice and resentence Salgado on the remaining conviction.

BACKGROUND

On July 10, 2023, deputies responded to a suspected domestic disturbance at Salgado's property. One of Salgado's significant others, T.S., called 911, blurted out the address, and said she had been hit on the head with a hammer. The call disconnected and the 911 operator dispatched emergency services to the address, unable to reestablish contact with the caller.

Upon arrival, a deputy detained Salgado. Salgado said that T.S. had become upset, sprayed him with pepper spray, and was throwing things inside his trailer.

Another deputy located and interviewed T.S. T.S. explained that an altercation between her and Salgado started when Salgado's estranged wife came to the property. T.S. told the deputy Salgado was throwing blocks of wood at her and she sprayed him with pepper spray. As the pepper spray wore off, T.S. was leaving Salgado's trailer, but he followed her with a hammer in hand. T.S. sprayed Salgado with pepper spray again. T.S. reported that she was about ten feet away from Salgado when he threw the hammer at her, striking her on the back of the head.

According to her testimony, T.S. called 911 about two hours after she was hit with the hammer. When emergency responders arrived, she was holding a bloody cloth against the back of her head. She was able to engage in small talk with emergency responders and expressed that she was feeling pain, though the bleeding had mostly stopped. The EMT[2] recommended T.S. be transported by ambulance to the hospital to get stitches.

At the hospital, T.S. told the triage nurse and treating physician that her boyfriend threw the hammer that struck her head and caused the injury. Following a CT[3] scan that showed no brain bleeding or injury to the cervical spine, the physician cleaned the wound and stapled the laceration closed. T.S. declined to give a statement to police at the hospital.

*Law enforcement investigation*

Salgado was arrested and charged with second degree assault—domestic violence with a deadly weapon. Law enforcement did not locate the hammer during its investigation. Salgado was in custody at various points while awaiting trial. During those periods of incarceration, Salgado made phone calls from jail to his estranged wife and his brother. The calls were partly in English and partly in Spanish.

---

[2] Emergency medical technician.
[3] Computed tomography.

The prosecuting attorney tasked a deputy with reviewing Salgado's jail phone calls to locate any information "of evidentiary value." Clerk's Papers at 130. The deputy identified multiple calls made between July and September that she deemed of evidentiary value. During one such call on September 29, Salgado told his brother that the hammer was located on top of the trailer. Salgado instructed his brother to retrieve the hammer while wearing gloves and to give it to his sister. Based on the recorded call, the State amended the information and charged Salgado with tampering with physical evidence as an accomplice on or about September 29, 2023.

*Pretrial Motions*

At a pretrial hearing, the court addressed several motions in limine. Salgado moved to exclude the State's proposed expert witness on domestic violence as unqualified. He also raised concerns that the witness's testimony would improperly suggest prior bad acts by Salgado. The court addressed its own concerns about the expert witness commenting on the veracity of the complaining witness. Details with respect to these issues are set forth in the analysis section below.

Salgado also moved to exclude the 911 call as hearsay or under the best evidence rule. The State had not preserved the recording, so it planned to call the 911 operator as a witness and refresh her memory with notes from the call. The call notes indicated that "the line was opened, a female yelled the address, and then stated . . . hit me in the head with a hammer, struggling, disconnect." Rep. of Proc. (RP) at 244. The State's position

4

was that "hit me in the head with a hammer" was non-testimonial and admissible under excited utterance, present sense impression, and then-existing state of mind exceptions to hearsay. Salgado requested, in the alternative, a jury instruction permitting the jury to infer that the missing 911 tape benefitted the defendant. The court ruled that it would "admit what [the 911 operator] may have heard to the extent it's admissible under 803(a)(1), (2), and (3)" and denied the additional instruction. RP at 264.

*Trial*

The State's first witness was the 911 operator who testified consistent with the facts above. She testified that the caller said she had been hit on the head with a hammer.

T.S. testified that her injury was self-inflicted. She said an altercation began when Salgado's estranged wife came to the property and he left with her. When he returned 20 minutes later, T.S. had thrown clean clothes and all his tools out of the trailer. She testified that she "was raging." RP at 594. At one point she went outside to help pick up the things she threw, "but he kept talking shit, so I [pepper] sprayed him again." RP at 599. Then, T.S. returned to the trailer and continued to throw things. She testified that she was holding onto a hammer with both hands, swinging it like a baseball bat or golf club when it hit her on the head. She recounted: "So when I was swinging as abruptly as I was at everything inside the trailer, I had lost my footing, and when I was—because it rocks. The trailer rocks. I—when I was swinging, and I lost my footing, I was

overswinging, and it left my hand, and hit me in the back of the head. That's when I fell." RP at 608.

When asked why she blamed Salgado for her injury at the time, she answered, "because of the next two hours of fighting and shit talk and just, I just wanted to get at saying some of the things that he does that it just—it gets you to this blurring point where just, like, I want to lash out and hurt him back so badly, because of how bad it hurts." RP at 613.

The State also asked T.S. about the extent of her injuries and why she waited to call 911. T.S. explained that neither she nor Salgado called 911 because they did not realize the cut was as bad as it was. She stated that she "had to go to the other property and get on Wi-Fi in order to get connection to call" and in a rural area like where they lived, most injuries required you to "kind of suck it up." RP at 588, 590. She called and asked for an ambulance "eventually . . . like, two hours later" because it was still bleeding. RP at 589.

Next, the State called a representative from Sage Advocacy Center who managed the domestic violence programs. She confirmed she had not met any parties involved in the case, was unaware of the allegations, and was testifying strictly to common patterns and accepted training. The program manager explained that she had one-and-one-half years of experience working with domestic violence victims and her training included an online course and one week of "Core" training. Core training includes nationally

6

accredited information about domestic violence and strategies to help advocates support their clients. The program manager then proceeded to testify about generalized characteristics of domestic violence victims without any objection from Salgado as to her qualifications or the nature of her testimony.

The physician who treated T.S. at the hospital testified that the injuries were consistent with T.S.'s original indication that a hammer was thrown and hit her head. The physician further testified that it was less than plausible that the injury could have been self-inflicted.

Finally, the State called the deputy who had been tasked with reviewing Salgado's jail calls for evidentiary value. She was chosen for the task because she was on light duty and she was fluent in Spanish, having grown up in a Spanish-speaking household. The deputy testified that reviewing and reporting on the phone calls was her only involvement with the case.

The State asked the deputy to summarize three of the recorded jail calls and moved to admit them into evidence. Salgado did not object to the recorded audio but opposed the deputy's testimony: "No issue as to the audio, Judge. Again, renewing my objection with best evidence." RP at 655, 659-60, 670. Salgado argued the jail calls should be played, not read from notes or otherwise relayed by the deputy. The court permitted the deputy's testimony because "the calls were at least partially in Spanish." RP at 655.

7

The first call occurred on July 11, 2023, between Salgado and his estranged wife. The jury heard portions of the audio. At one point, Salgado's estranged wife told him: "Well, stop complaining. You put yourself in this situation." RP at 659. Salgado responded: "No, I did not. (Inaudible). (Speaking Spanish) fucking hit her (speaking Spanish)." RP at 659. When asked what she heard on the call, the deputy responded: "So it was (inaudible) but I didn't think I was going to fucking hit her. I threw it somewhere else, then followed by (speaking Spanish)." RP at 655. The deputy explained: "So (speaking Spanish) translates to throw, and (speaking Spanish) translates to sound effects. (Speaking Spanish) translates to, and it hit him or her." RP at 656. The deputy inferred Salgado was referring to T.S. but there was no indication as to what was thrown.

The second call occurred September 29, 2023, between Salgado and his brother. The deputy testified: "So it translates to, my attorney is going to call [my sister] because the hammer—the hammer is on top of the trailer. . . . don't grab it with anything. Grab it with gloves and give it to [my sister]." RP at 663. The deputy's testimony continued:

> And then [Salgado's brother] again confirms (speaking Spanish), which
> translates to, the hammer is on top of your trailer, right? [Salgado]
> responds with (speaking Spanish), something muffled (speaking Spanish),
> it's a brown hammer, which translates to yes, it's on top, I, something
> muffled, to the top, it's a brown hammer. And that's it.

RP at 665.

8

After speaking with his brother, Salgado called his estranged wife. Again, the deputy translated Salgado's words:

> That translates to, I already told—it's muffled—to grab the hammer that's in the trailer and the spray can. . . . the hammer that [T.S.] hit herself with, she hit herself, and then she has a lot of cuts.

RP at 670. Later in the call, Salgado told his estranged wife in English, "[T.S.] did it." RP at 675. She replied, "You should've blamed it on her." RP at 675. Continuing to speak in English, Salgado said, "I did. [T.S.] said (inaudible)." RP at 675.

On cross-examination, defense counsel asked the deputy one question: "Can you tell the jury what (speaking Spanish) means?" RP at 681. She answered, "she hit herself." RP at 681-82.

After the State rested, Salgado moved unsuccessfully for a directed verdict on the second degree assault charge. Then, the parties discussed their proposed jury instructions. The State offered WPIC 6.51[4] that instructs the jury to determine the credibility and weight to be given to expert opinion. Salgado objected, arguing the program manager was never qualified or acknowledged by the court as an expert witness. The court granted the proposed instruction, noting that although she was not identified to the jury as an expert, there was significant discussion ahead of time about the expert witness, and the State's intention and purpose was clear.

---

[4] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.51 at 217 (5th ed. 2021).

The jury found Salgado guilty as charged.

Salgado appeals.

ANALYSIS

1. EXPERT TESTIMONY

Salgado contends the trial court erred by admitting expert testimony on the general characteristics or conduct of persons involved in a domestic violence relationship. On appeal he raises three related issues: the expert was not qualified, the testimony was unduly prejudicial because it implied that Salgado physically abused T.S. in the past, and the testimony provided an improper opinion on T.S.'s credibility. We decline to review these errors because they were not preserved below and Salgado does not claim any exception to the lack of preservation.

*A. Additional Background*

At some point prior to trial, T.S. made it known to the parties that she was evading service of the subpoena and if she did testify, would claim that her injury was self-inflicted. The State indicated an intent to call an expert witness who would explain why domestic violence victims might be reluctant to testify or change their story. During pretrial motions, Salgado raised two objections to the proffered testimony. He argued that the State's proposed witness was not qualified to give an opinion on the subject matter and any opinion would be unduly prejudicial. The trial court raised concern that the expert could not give an opinion on the veracity of T.S. as the complaining witness.

With respect to the witness's qualifications, Salgado described the witness as a program manager at a local domestic violence agency and pointed out that she was not a social worker or professionally recognized as an expert. The State proffered that the program manager had one-and-a-half years of experience working at Sage. During the pretrial hearing the trial court made a tentative ruling, indicating that the witness was probably qualified, but the court would keep an open mind if the witness's testimony demonstrated that her experience was not relevant.

> I think the year and a half working at Sage is—you know, I haven't heard all of her qualifications, but I'm not feeling a gravitational pull just based on what I've heard so far to think that she's—that she's not going to be able to establish those credentials under 702.
> Now, it might be different if I hear, well, she's only worked part time, and she never had any meaningful experience. She was more of a receptionist. And, you know, if we get it too far down that road, you know, obviously I'm going to keep an open mind about this. But just based on what I've heard and given her current position, it sounds like she's going to meet the threshold under 702.

RP at 276-77.

Next, Salgado argued that because the State was not offering evidence of prior bad acts, any testimony by the witness regarding the "cycle of violence" would be unduly prejudicial. The trial court agreed and ruled that the State's expert could not discuss the

11

cycle of violence. Salgado indicated he did not have any other objections to the expert's proposed testimony.[5]

Finally, the trial court addressed its own concerns about the expert witness improperly giving an opinion on T.S.'s credibility. The court noted that if it found the expert's opinions to be admissible at trial, the witness's opinions must be limited to generalizations, and the witness could not apply these characteristics to the complaining witness. The State then assured the court that the expert did not know the parties in this case.

At trial, the program manager testified that in addition to her experience, she received one week of formal training on what domestic violence looks like and how to support clients as an advocate. Salgado did not ask to voir dire the witness on her qualifications and did not renew his objection to her qualifications.

The witness proceeded to testify about patterns of behavior that were typical of people in abusive or toxic relationships. The expert did not use the term "cycle of violence." During redirect, the witness described characteristics of domestic violence and a toxic relationship. Other than objecting that the testimony on redirect was outside the scope of cross-examination, Salgado did not object to this testimony as suggesting prior bad acts or commenting on the veracity of T.S.

---

[5] Salgado asked for a *Frye* hearing on the expert's testimony but does not raise this issue on appeal. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

## B.  Error Preservation

"An established rule of appellate review in Washington is that a party generally waives the right to appeal an error unless there is an objection at trial."  *State v. Kalebaugh*, 183 Wn.2d 578, 583, 355 P.3d 253 (2015) (citing RAP 2.5(a)).  We follow this rule strictly because "trial counsel's failure to object to the error robs the court of the opportunity to correct the error and avoid a retrial."  *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009).  To be properly preserved, the issue raised at trial must be specific. *Mad River Orchard, Inc. v. Krack Corp.*, 89 Wn.2d 535, 537, 573 P.2d 796 (1978). Additionally, the appellant must argue the same, specific ground on appeal as was raised at the trial court.  *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985).

There are several important policy objectives for requiring contemporaneous objections at the trial court level to preserve issues on appeal.  The requirement "encourages parties to make timely objections, gives the trial judge an opportunity to address an issue before it becomes an error on appeal, and promotes the important policies of economy and finality."  *Kalebaugh*, 183 Wn.2d at 583.  The rule also "facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address."  *State v. Torres*, 198 Wn. App. 864, 876, 397 P.3d 900 (2017).

13

### C.  Application

Here, the three challenges to the expert's opinion testimony raised by Salgado on appeal were not preserved by objection.

Salgado's first challenge to the expert testimony is that the witness was not qualified to give an opinion on behaviors and patterns of persons in a domestic violence relationship.  Although the witness's qualifications were discussed at a pretrial hearing and the court commented that the witness was probably qualified, at most the court was making a tentative ruling.

When a trial court makes a final ruling on a motion in limine, the party raising the motion has a standing objection and no further objection is needed to preserve the issue for appeal.  *State v. Roosma*, 19 Wn. App. 2d 941, 948, 498 P.3d 59 (2021).  On the other hand, a tentative ruling that is subject to the development of additional evidence at trial requires further objections at trial to preserve the issue.  *Id*. at 948-49.

Here, the trial court made it clear at the pretrial hearing that it was keeping an open mind on the witness's qualifications.  Thus, Salgado was required to renew his objection at trial to preserve the issue for appeal.  His failure to do so waives the issue on appeal.  RAP 2.5(a).

Salgado's next contention is that the expert's testimony was irrelevant and unduly prejudicial under ER 402 or 403.  Salgado argues that the expert provided an opinion on the behavior of persons in a domestic violence or toxic relationship.  But since there was

no evidence that T.S. was involved in a domestic violence or toxic relationship, the opinion testimony was unduly prejudicial because it allowed the jury to infer without evidence that "Salgado was an abuser when he was not." Appellant's Br. at 34-35, 37. Again, we conclude that this issue was not preserved below.

During motions in limine, Salgado's request was very specific: prohibit the witness from using the phrase "cycle of violence." The court granted this request and Salgado confirmed that he did not have any other concerns. At trial, when the witness referred to domestic violence or to toxic relationship, Salgado did not object. Thus, the ER 402 and 403 issues he raises on appeal were not preserved.

Likewise, there was no objection raised either during pretrial motions or at trial that the witness was testifying on the veracity of the complaining witness. Nor does Salgado contend that this error falls within an exception to waiver. *See* RAP 2.5(a)(3). Had timely and contemporaneous objections been raised on these issues, the trial court could have addressed the concerns, and the record would be fully developed for appellate review. In the absence of such objections, we find the issues waived and decline to review them.

2. JAIL PHONE CALLS

Salgado argues that his jail calls were not admissible evidence because the right to privacy in Washington's Constitution article I, § 7 includes a right to be free from a prosecutor-initiated search of jail calls for investigatory purposes unrelated to

15

institutional security. Notwithstanding his failure to object below, Salgado argues that the waiver exception for manifest constitutional error applies under RAP 2.5(a)(3). The State opposes Salgado's characterization of the alleged error as manifestly constitutional and further argues that jail calls are not "private affairs" protected by art. I, § 7; thus, Salgado did not have a reasonable expectation of privacy. We decide that review is not warranted under RAP 2.5(a)(3).

Generally, we will not review a claim of error raised for the first time on appeal unless it is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). This "'exception actually is a narrow one, affording review only of certain constitutional questions.'" *State v. Kirkman*, 159 Wn.2d 918, 934, 155 P.3d 125 (2007) (internal quotation marks omitted) (quoting *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988)).

> [T]o qualify as a claim of manifest error affecting a constitutional right, the defendant must identify the constitutional error and show that it actually affected his or her rights at trial. The defendant must make a plausible showing that the error resulted in actual prejudice, which means that the claimed error had practical and identifiable consequences in the trial.

*State v. Lamar*, 180 Wn.2d 576, 583, 327 P.3d 46 (2014). "RAP 2.5(a)(3) serves a gatekeeping function that will bar review of claimed constitutional errors to which no exception was made unless the record shows that there is a fairly strong likelihood that serious constitutional error occurred." *Id.*

16

Here, Salgado is unable to identify a constitutional error or a constitutional right that was affected by error. He acknowledges that article I, § 7, has not been interpreted to protect the privacy of jail calls from non-safety related searches, nor does such a right exist under the privacy act.[6] However, in urging this court to adopt a novel reinterpretation of our constitution, he necessarily concedes such a constitutional right has not been recognized.

Additionally, Salgado fails to show the alleged error is manifest. Salgado asserts that under *State v. A.M.*,[7] an error is manifest if objected to on any other grounds because any objection alerts the trial court to the error. Indeed, "A.M. [made] a plausible showing that the error had practical and identifiable consequences at trial because the trial court admitted the evidence over the objection of counsel, albeit on different grounds." *Id*. But Salgado paints with too broad a brush.

Instead, "to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." *State v. O'Hara*, 167 Wn.2d 91, 100, 217 P.3d 756 (2009). Absent an objection on precise grounds, the trial court could not have been apprised of the novel argument Salgado raises on appeal.

---

[6] Chapter 9.73 RCW.
[7] 194 Wn.2d 33, 40, 448 P.3d 35 (2019).

Nor is the alleged error "so obvious on the record that the error warrants appellate review." *Id.*

We decline to address the issue on the merits.

3.   TRANSLATION OF EVIDENCE BY DETECTIVE

Salgado contends the trial court violated his due process rights and failed to follow RCW 2.43.030 when it allowed an investigating officer to translate recorded jail calls from Spanish to English for the jury at trial. Salgado argues preliminarily that the issue is preserved for appeal because he objected on other grounds at trial; alternatively, the error is manifestly constitutional. The State concedes the court abused its discretion by failing to make a good cause finding before appointing an uncertified interpreter but argues that any error was harmless.

At trial, Salgado objected to the deputy's testimony on best evidence grounds. On appeal, he abandons his best evidence objection and argues the court erred on other grounds. Because he is making a different argument on appeal, the claimed error was not preserved for review. *See Guloy*, 104 Wn.2d at 422.

Nevertheless, Salgado contends his objection was sufficient to preserve the error because "while perhaps not artfully worded, [it] gave the court enough information to consider and rule on the translation issue." Appellant's Br. at 43 (citing *State v. Walker*, 75 Wn. App. 101, 109, 879 P.2d 957 (1994)). Indeed, "an appellate court may consider the propriety of a ruling on a general objection if the specific basis for the objection is

'apparent from the context.'" *Walker*, 75 Wn. App. at 109 (quoting *State v. Braham*, 67 Wn. App. 930, 934-35, 841 P.2d 785 (1992)). But this leniency does not apply here. The best evidence rule provides that the original recording is required to prove the content of that recording unless an exception applies. ER 1002. Here, the original recordings were admitted and played for the jury. And even though the court allowed the testimony because "the calls were at least partially in Spanish" Salgado's newly asserted grounds— a violation of his due process rights and the court's failure to follow RCW 2.43.030—are not apparent from the context.

Notwithstanding Salgado's failure to preserve his claimed error, we exercise our discretion to address the issue because the record is fully developed and the issue is sufficiently briefed. *See* RAP 2.5(a).

Salgado contends, and the State concedes, the court violated RCW 2.43.030 by appointing an uncertified interpreter without finding good cause on the record. But RCW 2.43.030 does not apply, and both parties mischaracterize the evidence.

RCW 2.43.030(1)(a) provides: "Credentialed interpreters shall be appointed in legal proceedings involving participation of persons with *limited English proficiency*, unless good cause is found on the record for appointing a noncredentialled interpreter." (emphasis added). The purpose of this rule is "to secure the rights, constitutional or otherwise, of persons who, because of a non-English-speaking cultural background, are *unable to readily understand or communicate in the English language*, and who

19

consequently cannot be fully protected in legal proceedings unless interpreters are available to assist them." RCW 2.43.010 (emphasis added).

Here, the court did not appoint an interpreter to assist persons with limited English proficiency. Instead, the testimony was offered to assist persons with little or no *Spanish* proficiency. As such, ch. 2.43 RCW was not implicated, and the court did not violate the statute.

Instead, a testifying witness who is or acts as an interpreter is governed by the rules of evidence. *See* ER 604. We review evidentiary rulings for abuse of discretion. *State v. Morales*, 154 Wn. App. 26, 37, 225 P.3d 311 (2010). "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). An abuse of discretion also occurs when the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law. *Id.* at 284.

ER 604 provides: "An interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation to make a true translation." Thus, the interpreter witness is subject to the expert qualification rules of ER 702. ER 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Here, the court acknowledged the deputy's specialized knowledge of the Spanish language would assist the jury in understanding the communications exchanged in the jail calls. Additionally, the deputy was qualified by her knowledge, skill, and experience because she testified that she was fluent in Spanish and grew up in a Spanish-speaking household. However, the court did not administer a specific oath or affirmation ensuring a true translation. *See* ER 604. Its failure to do so was an abuse of discretion.

On appeal, evidentiary errors will not result in reversal unless, "within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981). Salgado argues the error was not harmless because the interpreter was biased and the biased translation of Salgado's "confession" was the only evidence that he admitted to any assaultive behavior. This argument fails for two reasons. First, Salgado does not claim that the deputy was inaccurate in her translation of the jail calls or failed to provide a true translation. Moreover, Salgado expressly declined to object to the three audio recordings, and consequently, the contents of the recordings. The failure to administer the special oath did not materially affect the outcome of the trial and was harmless.

Salgado further contends the State must prove the error was harmless beyond a reasonable doubt because it is a constitutional error that violated his due process rights to

a fair trial. This argument—and Salgado's argument that review is warranted under RAP 2.5(a)(3)—fails because the claimed error is not constitutional. "In instances where the allegation is that the defendant's due process rights were violated because he or she was denied a fair trial, the court will look at the defendant's allegation of a constitutional violation, and the facts alleged by the defendant, to determine whether, if true, the defendant's constitutional right to a fair trial has been violated." *O'Hara*, 167 Wn.2d at 98-99.

Here, again, Salgado mischaracterizes the deputy's translation from Spanish to English as a violation of a defendant's constitutional right to an interpreter when the defendant has limited English proficiency. In Washington, "the right of a defendant in a criminal case to have an interpreter is based upon the Sixth Amendment constitutional right to confront witnesses and 'the right inherent in a fair trial to be present at one's own trial.'" *State v. Gonzales-Morales*, 138 Wn.2d 374, 379, 979 P.2d 826 (1999) (quoting *State v. Woo Won Choi*, 55 Wn. App. 895, 901, 781 P.2d 505 (1989)). But Salgado did not require an interpreter, and the deputy was not appointed as such; thus, Salgado's constitutional rights are not at issue.

Although the deputy's translation did not implicate Salgado's rights under the constitution or RCW 2.43.030(1)(a), the court did abuse its discretion by failing to administer a special oath under ER 604. Nevertheless, we find this error harmless.

4.   HEARSAY

Salgado contends the court abused its discretion by allowing the 911 operator to testify to T.S.'s statement that she was hit on the head with a hammer because the statement was inadmissible hearsay and not subject to an exception.  The State argues T.S.'s statement was admissible because it was nontestimonial and made during an ongoing emergency.  We conclude that the error, if any, was harmless.

Questions regarding the admissibility of evidence are reviewed for abuse of discretion.  *State v. Arumugam*, 30 Wn. App. 2d 411, 426-27, 545 P.3d 363 (2024).  A trial court abuses its discretion by making its decision on untenable grounds or for untenable reasons.  *Id.* at 427.  However, "[t]he erroneous admission of hearsay evidence is a nonconstitutional error and is therefore harmless if, within reasonable probabilities, the error did not materially affect the outcome of the trial."  *Id.* at 430-31.

Here, the parties agree that T.S.'s statement "hit me in the head with a hammer" as testified to by the 911 operator was hearsay.  The State argues the statement was admissible as a present sense impression, excited utterance, or a statement of then-existing mental, emotional, or physical condition.  *See* ER 803(a)(1)-(3).  Salgado provides ample briefing disputing the State's theories.  He also contends the error was not harmless because the 911 call was critical to the State's theory and bolstered its argument that T.S. lied on the stand.

We conclude that even if the court erroneously admitted hearsay—which we do not decide—any error was harmless. When considered in the context of all the evidence presented at trial, the eight-word phrase Salgado objects to is inconsequential. The statement itself does not attribute blame and none of the parties dispute that T.S. was struck on the head with a hammer. In addition, the statement was cumulative. One of the responding deputy's body camera footage, which was admitted at trial, showed T.S. telling the deputy, "I got hit in the back of the head with a hammer." RP at 734. T.S. went on to disclose that Salgado threw the hammer. During her testimony, T.S. did not dispute that she told authorities she was hit on the head with a hammer at the time of the incident. The physician also testified that T.S. reported to multiple hospital personnel that her boyfriend threw the hammer that struck her head. Because the statement, as relayed by the 911 operator, was neutral and otherwise insignificant given the totality of the evidence, it is not reasonably probable that the testimony materially affected the outcome of the trial.

5. TAMPERING WITH PHYSICAL EVIDENCE

Salgado argues his conviction for tampering with physical evidence as an accomplice is not supported by sufficient evidence because the State did not prove a completed crime. The State argues the jury had sufficient evidence to convict because Salgado instructed his brother to move the hammer. We agree with Salgado.

"The State has the burden of proving the elements of a crime beyond a reasonable doubt." *State v. Clark*, 190 Wn. App. 736, 755, 361 P.3d 168 (2015). When a defendant makes a sufficiency of the evidence challenge, we view "the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 755. If the State fails to present sufficient evidence to prove every element of the crime, the remedy is to reverse the conviction and dismiss with prejudice. *State v. Hickman*, 135 Wn.2d 97, 103, 954 P.2d 900 (1998). Inferences drawn from evidence must be reasonable and not be based on speculation. *Ayers v. Johnson & Johnson Baby Prod. Co.*, 117 Wn.2d 747, 753, 818 P.2d 1337 (1991).

An accomplice is someone who, "[s]olicits, commands, encourages, or requests [an]other person to commit [a crime]." RCW 9A.08.020(3). A defendant who acts as an accomplice can be found guilty of the crime committed by the conduct of another person. *See* RCW 9A.08.020. "Under an accomplice liability theory, the State must prove the substantive crime was committed." *State v. Lazcano*, 188 Wn. App. 338, 363, 354 P.3d 233 (2015).

To convict for tampering with physical evidence, the State must prove the actor "[d]estroy[ed], mutilate[d], conceal[ed], remove[d], or alter[ed] physical evidence with intent to impair its appearance, character, or availability." RCW 9A.72.150.

Here, the State failed to prove the substantive crime was committed. The record does not contain any evidence presented by the State to show the hammer was destroyed, mutilated, concealed, removed, or altered on or after Salgado's conversation with his brother on September 29. Arguably Salgado's instruction to move the hammer is evidence of an attempt to tamper with the evidence, but Salgado was not convicted of an inchoate crime and the State failed to produce evidence of a completed crime.

The State, in its response, seems to argue that sufficient evidence supports a jury's conclusion that Salgado tampered with evidence by placing the hammer on top of the trailer on July 10. But the State did not charge Salgado with a tampering crime occurring July 10, and the jury was instructed to determine whether a crime occurred on September 29. Thus, this argument is untenable.

The State also suggests this issue was not preserved for appeal because Salgado timely moved for a directed verdict at trial for the second degree assault charge but did not seek the same for the tampering charge. This argument fails because a defendant may raise a sufficiency of evidence claim for the first time on appeal. RAP 2.5(a)(2).

In sum, when all facts and reasonable inferences are viewed in the light most favorable to the State, there is insufficient evidence for a rational jury to convict Salgado of tampering with physical evidence as an accomplice on September 29.

26

CONCLUSION

We affirm Salgado's conviction for second degree assault. We reverse his conviction for tampering with physical evidence, and remand with instructions to dismiss the tampering charge with prejudice and resentence Salgado on the remaining conviction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, C.J.

WE CONCUR:

_____
Hill, J.

_____
Lawrence-Berrey, J.